UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Nathan Prue,

       Plaintiff,

      v.                                Civil Action No. 2:13-cv-13

Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 10, 15)

Plaintiff Nathan Prue brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits.  Pending before the Court are Prue's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 15).  For the reasons stated below, the Court DENIES Prue's motion, and GRANTS the Commissioner's motion.

## Background

Prue was 40 years old on his alleged disability onset date of August 30, 2007.  He attended school through the seventh grade, and thereafter obtained his GED.  He has work experience in carpentry, landscaping, construction, and factory work.  (AR 43–44, 211.)  He has four children, and is divorced from his wife of more than twelve years.  (AR 368.)

Prue's parents abused alcohol and other substances, and neglected Prue and his siblings when they were children.  (AR 402.)  His father left the home when Prue was an infant, leaving his mother to raise him.  (AR 368.)  Prue reports that he was physically and sexually abused by his various stepfathers starting at the age of five.  (AR 52, 333, 368–69, 402.)  He began smoking marijuana (with his mother) at age nine, and drinking alcohol at age sixteen.  (AR 333.)  When he was in the seventh grade, his mother dropped him off at an adolescent therapeutic center for substance abuse rehabilitation, where he lived for over four years.  (AR 40, 368.)  In January 2009, Prue was arrested on charges of domestic assault, and consequently served approximately six months in prison.  (AR 59, 368.)  While he was imprisoned, Prue's wife sought divorce and custody of their children.  (AR 59, 336, 343–44.)  Prue has also been arrested multiple times for possession of marijuana, and at least once for stealing alcohol from a store.  (AR 403.)  According to Prue, he has been incarcerated "for about seven years of [his] life."  (AR 59.)

Prue testified at the July 2011 administrative hearing that he was "homeless" and staying in his mother's garage which had no kitchen or bathroom facilities.  (AR 41.)  He stated that he did not have a driver's license because he failed to attend a court date or pay a fine related to an automobile accident.  (AR 41–42.)  He stated that he smokes approximately one pack of cigarettes each day, drinks approximately four beers each day (but not every day), and smokes marijuana once or twice a week.[1]  (AR 42–43.)

---

[1]  Although Prue testified at the July 2011 administrative hearing that he drinks four beers a day and smokes marijuana one or twice a week (AR 42–43), in June 2010, Dr. Williams recorded that Prue "smoke[s] two joints per day" and "drinks two beers a day" (AR 402).

On September 28, 2009, Prue protectively filed applications for social security income and disability insurance benefits.  Therein, he alleges that, since August 30, 2007, the following illnesses, injuries, or conditions have limited his ability to work: posttraumatic stress disorder ("PTSD"), adjustment disorder, depression, anxiety, and attention deficit hyperactivity disorder ("ADHD").[2]  (AR 187.)  He claims that he has a difficult time adjusting to change, has anxiety around crowds and people he does not know, and has trouble concentrating and remembering things.  (*Id.*)  He further claims that he cries a lot and "think[s] about the past and get[s] angry and emotional."  (*Id.*)  Prue later updated his disability application to include allegations that he is unable to use his left arm due to an injury and subsequent surgery.  (AR 252.)  The record also reveals that Prue has complained of respiratory problems, and injuries to his wrist, heel, and ankle.  (*See, e.g.*, AR 48–51.)

Prue's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on July 6, 2011 by Administrative Law Judge ("ALJ") Paul Martin.  (AR 35–75.)  Prue appeared and testified, and was represented by an attorney.  A vocational expert ("VE") also testified at the hearing.  On July 29, 2011, the ALJ issued a decision finding that Prue was not

---

[2]  Prue's testimony at the administrative hearing suggests that he also believed reasons other than his impairments caused him to be unable to work, including a lack of jobs, his criminal record, and the fact that he had no vehicle.  (AR 58.)  Prue stated: "I can only work so much and there's no work up there.  And I don't have a vehicle "  (Id.)  Also indicative of Prue's belief that reasons other than his impairments caused his disability, Prue's treating psychologist, Judy Young, M.A. recorded in her March 2009 Intake Assessment that Prue was applying for disability "due to his situation of being homeless and jobless following [his divorce and incarceration for battering his wife]."  (AR 369.)  Approximately two years later, in 2011, Young stated in a progress note: "[Prue] noted that disability wants to know why he changed in his ability to functi[on] [and] [h]e noted [the following] changes: lost license, lost job, got a criminal record, hurt ankle, [and] hurt arm."  (AR 544.)

disabled under the Social Security Act at any time from his alleged onset date through the date of the decision.  (AR 17–29.)  Thereafter, the Appeals Council denied Prue's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies, Prue filed the Complaint in this action on January 17, 2013.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Prue had not engaged in substantial gainful activity since his alleged disability onset date of August 30, 2007.  (AR 19.)  At step two, the ALJ found that Prue had the following severe impairments: PTSD, depression, ADHD, remote ankle fracture, left wrist ganglion, and status post left hand open reduction internal fixation surgery.  (*Id.*)  Conversely, the ALJ found that Prue's respiratory problems, including his asthma, were non-severe.  (AR 20.)  At step three, the ALJ found that none of Prue's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 20–22.)

Next, the ALJ determined that Prue had the RFC to perform medium work, as defined in 20 C.F.R. § 404.1567(c), except as follows:

> [Prue] is limited with regard to his non-dominant left upper extremity to occasionally lifting 10 lbs. independently but otherwise generally can lift up to 50 lbs. occasionally when used in combination with his right upper extremity.  [He] has no particular restrictions in relation to sitting or standing, but is limited to walking for 2 hours at one time.  He can stand or

walk for a total of 6 hours in an 8-hour workday.  [He] can only
occasionally climb ladders, ropes[,] or scaffolds.  He can only perform the
manipulative task of handling on a frequent but not constant basis with his
non-dominant left hand.  [Prue] can only perform work that is simple and
routine in nature, requiring only simple work-related decisions and the
ability to adapt to routine workplace changes.  [He] requires work that is
largely isolated from the public, with only passing and casual, or superficial
interactions with co[]workers and supervisors.   Work interactions with
co[]workers and supervisors must only be on an occasional and routine
basis.   He cannot work in any sort of team environment, or work with
co[]workers and supervisors on a regular and sustained basis.   [He] can
work in the same area as others, but would need to work largely on his own
in the performance of tasks.  He would need a job where he could perform
work on his own, rarely checking in with his supervisor, maybe two or
three times per day and receiving only limited instruction from his
supervisor.  He has the ability to work around other people, but just not
with them.  [He] can maintain focus for 30 minutes at a time but requires a
break for between three to five minutes in order to refocus himself and get
back on task.

(AR 22–23.)  Given this RFC, the ALJ found that Prue was unable to perform his past

relevant work as a carpenter, a landscape foreman, a gutter hanger, a machine operator,

and a factory worker.  (AR 27.)  Based on testimony from the VE, however, the ALJ

determined that Prue could perform other jobs existing in significant numbers in the

national economy, including landscape specialist, industrial cleaner, and automobile

detailer.  (AR 28–29.)  The ALJ concluded that Prue had not been under a disability from

the alleged onset date of August 30, 2007 through the date of the decision.  (AR 29.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

      In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I.     The ALJ Did Not Err in His Analysis of the Opinions of Treating Mental Health Providers Young and Dr. McNamara

Prue contends the ALJ erred in assigning "little weight" (AR 27) to the opinions of Prue's treating psychologist, Judy Young, M.A., and treating psychiatrist, Michael McNamara, D.O.  The Commissioner disagrees, asserting that the ALJ correctly analyzed these opinions and provided good reasons in support of his allocation of weight thereto.

Prue began treating with Young in October 2009.  (AR 366–69.)  In her Intake Evaluation, Young recorded that Prue came to see her "on his own to get emotional support as he goes through his divorce[,] as well as to learn to more effectively interact with people and to not break down in tears so often."  (AR 369.)  Young wrote that Prue told her he was applying for social security benefits because he was "'mentally broken' since going to prison" (AR 368), and he needed support "during this difficult time" (AR 367).  Upon examination, Young observed that, although Prue was tense and tearful at times, he was fully oriented, maintained good eye contact, described logical and coherent thoughts, and exhibited normal insight and judgment.  (AR 369.)  Young diagnosed Prue with adjustment disorder with mixed anxiety and depressed mood.  (*Id.*)  Thereafter, Prue met with Young on several occasions.  (*See, e.g.*, AR 373–79, 505–12, 543–51.)  In January 2011, Young completed an assessment of Prue's mental RFC, opining that Prue had marked difficulties in social functioning and maintaining concentration, persistence, or pace; was unable to understand, remember, and carry out one-to-three-step tasks; and could not maintain concentration and attention for two-hour periods.  (AR 442, 444.)

Young stated that Prue's impairments significantly interfered with his ability to follow workplace rules, deal with normal stress in the workplace, function independently, and interact appropriately with coworkers and supervisors.  (AR 444–45.)  Young concluded that Prue's impairments would cause him to be absent from work "[f]our or more times per month."  (AR 446.)

In October 2010, approximately one year after beginning treatment with Young and three years after the alleged disability onset date, Prue began treating with Dr. McNamara.  (AR 520–23.)  In his Initial Assessment, Dr. McNamara recorded that Prue's chief complaint was: "'I feel like God has turned the world against me.'" (AR 520.)  Dr. McNamara stated that Prue had become "extremely anxious and irritable along with [experiencing] some depression," and that these symptoms were "aggravated by recent difficulties in his social life," including his divorce and his ex-wife preventing him from visiting his children.  (*Id.*)  Upon examination, Dr. McNamara observed that, although Prue was fidgety, hyperactive, and "markedly irritable and angry," he was fully oriented, cognitively intact, able to engage in a formal conversation, and had good insight and judgment.  (AR 522.)  Dr. McNamara diagnosed Prue with ADHD, depression, and possible PTSD, and prescribed various medications to address these conditions.  (*Id.*)  Prue continued to treat with Dr. McNamara during the alleged disability period.  In February 2011, Dr. McNamara completed an assessment of Prue's mental RFC, opining that Prue had extreme difficulties in social functioning and maintaining concentration, persistence, or pace; was unable to understand, remember, and carry out one-to-three-step tasks; and could not maintain concentration and attention for two-hour periods.  (AR

515–16.)  Dr. McNamara stated that Prue's impairments significantly interfered with his ability to follow workplace rules, deal with normal workplace stress, function independently, and interact appropriately with coworkers and supervisors.  (AR 516–17.) Dr. McNamara concluded that Prue's impairments would cause him to be absent from work "[a]bout three times per month."  (AR 518.)

The ALJ gave "little weight" to Young's and Dr. McNamara's opinions.  (AR 27.) Prue argues that this determination was flawed because the ALJ incorrectly stated that Young "is not considered an acceptable medical source" (*id.*), and gave no good reasons for the weight assigned to Young's and Dr. McNamara's opinions.  Although Prue is correct that the ALJ erred in stating that Young was not an acceptable medical source, *see Martell v. Comm'r of Soc. Sec.*, Civil Action No. 2:12-CV-152, 2013 WL 1429459, at *4 (D. Vt. Mar. 22, 2013) (in Vermont, masters in psychology qualify as "acceptable medical sources" under the regulations), the error was harmless because the ALJ gave other good reasons, supported by substantial evidence, for the weight assigned to Young's (and Dr. McNamara's) opinions.  *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion.").

The ALJ stated that the opinions of Young and Dr. McNamara were "somewhat inconsistent with treatment notes in relation to [Prue's] care, which show a good response to Adderall and a generally stable situation with [Prue's] limited treatment."  (AR 27.)  It was proper for the ALJ to consider whether Young's and Dr. McNamara's opinions were consistent with their own treatment notes and the medical record as a whole.  20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more

weight we will give to that opinion").  Moreover, substantial evidence, including the opinions of the consulting physicians (discussed below), supports the ALJ's conclusion that these opinions are generally inconsistent with the record.

First, as the ALJ observed, Prue's pursuit of treatment for his mental impairments has been "limited."  (AR 27.)  Although he alleges disability due to mental health problems beginning in August 2007, the record does not reflect that he sought or obtained mental health treatment prior to January 2009, when he was incarcerated for domestic assault and worried about his wife divorcing him and preventing him from seeing their kids.  (AR 354.)  It appears that Prue did not begin regular treatment for his mental impairments until he started seeing Young in late 2009, over two years after his alleged disability onset date.  (AR 367.)  Even then, he failed to attend therapy sessions with Young on a regular basis.  (*See, e.g.*, AR 374, 376.)  In her January 2011 assessment, Young described the frequency of her contact with Prue as "sporadic," explaining that she saw Prue "face to face" on only four occasions but had "multiple phone contacts" with him.  (AR 441.)  In fact, Young's office notes reveal only five brief "phone contacts" with Prue, most addressing merely scheduling issues.  (*See* AR 373–74, 376, 507–08.)  Young herself referred to the level of her office's contact with Prue as "minimal," stating: "[Prue] has made progress on his own.  He continues to advocate for himself.  With the minimal contact w[ith] this office his prognosis remains uncertain." (AR 443.)

Second, as the ALJ also observed (AR 27), once Prue began treating with Dr. McNamara—over three years into the alleged disability period—his mental health

improved, due at least in part to the Doctor's prescription of psychiatric medications (AR 520–29, 535).  A review of Dr. McNamara's treatment notes reveals his consistent reporting that prescribed medications, including Adderall and CeleXA, were effective in treating Prue's moodiness, irritability, hyperactivity, and depression.  (*See* AR 524 ("looks noticeably improved . . . [and] less irritable, less fidgety and less hyperactive"), 525 ("looks improved," "appears less fidgety, less irritable and less hyperactive" after increase in Adderall), 526 ("looks improved . . .[,] less anxious and less dysphoric . . .[,] less fidgety and less irritable"), 527 ("seems improved . . .[,] affect and mood [are] less irritable and less depressed," "seems less hyperactive and less fidgety since he has been maintained on Adderall"), 528 ("noticeably improved" due to Adderall), 529 (with Adderall, "seems less hyperactive and can better focus and concentrate"; with CeleXA, "seems less irritable, less depressed"), 532, 535.)  Dr. McNamara stated that Young agreed that Prue's condition was "improved," with him being "less hyperactive [and] less irritable."  (AR 532.)  And Prue's primary care provider, Dr. Denise Niemira, also acknowledged Prue's improvement while treating with Dr. McNamara, stating: "Dr. McNamara put[] him on antidepressant [medication] [and] he does not feel depressed– just angry and stressed."  (AR 541.)  Another sign of Prue's improvement: Dr. McNamara initially saw Prue every two weeks, but extended the time between appointments to four weeks starting in January 2011.  (*See, e.g.*, AR 524–29.)  Although the mere improvement in Prue's mental condition does not suggest that he no longer suffered from any mental impairment, or even that his mental impairments only minimally affected his ability to function; the treatment notes of Dr. McNamara, Young,

and Dr. Niemira do not align with the very severe limitations contained in Dr.
McNamara's and Young's opinions.

     The ALJ also properly noted that Prue looked for work and performed odd jobs
during the alleged disability period.  (AR 24.)  Several treatment notes indicate that Prue
was able to do limited work during the alleged disability period.  For example, Young
stated in a November 2009 progress note that Prue "said he wants to work *and is* but for
friends who don't have money to pay him."  (AR 377 (emphasis added).)  At the
administrative hearing, Prue testified that around the end of 2009 and beginning of 2010,
he did carpentry work for his girlfriend.  (AR 46.)  Young wrote in an April 2010
progress note that Prue was "spending time helping his uncle . . . do[] work on his
house."  (AR 507.)  In a November 8, 2010 progress note, Dr. McNamara wrote that Prue
"reports he has gone to work for a construction project up at Jay Peak" (AR 524), and
then in a November 22, 2010 note, that Prue "has been working at a construction
company now for a few weeks and is tolerating this" (AR 525).  A January 2011 progress
note from Dr. McNamara states that Prue "has been making hats and apparently Voc
Rehab has been encouraging him to sell them [and] [h]e has been selling some locally
with some success."  (AR 527.)  Young also stated in a January 2011 treatment note that
Prue reported he "is making hats to bring in income."  (AR 511; *see also* AR 54.)
Although certainly not proof of his ability to work full time, and not rising to the level of
substantial gainful activity, it was proper for the ALJ to consider these work activities in
deciding what weight to assign to the treating physician opinions.  *See* 20 C.F.R. §
404.1571 ("Even if the work you have done was not substantial gainful activity, it may

show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").

Another reason the ALJ provided in defense of his assignment of "little weight" to the opinions of Young and Dr. McNamara was that Prue "has been resistant to taking medication." (AR 27.) The ALJ reasoned as follows: "One would assume that someone suffering from a totally disabling level of mental health impairment would avail himself of all treatment opportunities in order to mitigate the severity [of] their symptoms." (*Id.*) The ALJ did not err in considering whether Prue sought treatment and complied with treatment recommendations in an effort to mitigate the effects of his mental impairments. The regulations state: "If you do not follow the prescribed treatment without a good reason, we will not find you disabled." 20 C.F.R. § 404.1530(b). And the Social Security Administration has determined that a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see also Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); *Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 209 n.14 (S.D.N.Y. 2010).

Substantial evidence supports the ALJ's finding that Prue was resistant to taking medication. For example, in May 2009, a mental health counselor who had met with Prue while he was in prison recorded that Prue "stopped [taking] Paxil and is not taking any [mental health] meds." (AR 338.) In his October 2010 assessment, Dr. McNamara

stated that Dr. Niemira had attempted to put Prue on Paxil, but he "refused to take it" (AR 521), and that "[Prue] seems resistant [to] taking meds currently for depression" (AR 523).  Prue himself stated at the administrative hearing that he "was always against [taking] medication."  (AR 56.)  Importantly, however, Prue has failed to give a reason why he opposed taking medication, and the record does not reveal one.  Prue correctly asserts that individuals with mental impairments may reasonably decline to take prescribed medications due to their negative side effects, or they may be incapable of consistently taking their prescribed medications as a result of their mental impairments. *See, e.g.*, *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011).  But there is no evidence to support either of these rationales in this case.

For these reasons, the Court finds that, although the ALJ erred in finding that Young was not an acceptable medical source, he gave other good reasons to support his assessment of Young's and Dr. McNamara's opinions, and these reasons are supported by substantial evidence.  Therefore, the ALJ did not err in affording little weight to these treating provider opinions.

## II.    The ALJ Did Not Err in His Analysis of the Opinions of Agency Consultants Drs. Atkins and Hurley

Nor did the ALJ err in affording "significant weight" to the opinions of non-examining agency consultants Drs. Ellen Atkins and Edward Hurley.  (AR 27.)  After reviewing the record, Drs. Atkins and Hurley each individually opined that Prue was able to retain the understanding and memory for one-to-three-step instructions; sustain concentration, persistence and pace for two-hour periods with possible "episodic

exacerbations" in symptoms which would temporarily undermine his cognitive functioning; have limited contact with the general public, performing best in "low[-]stress work settings" requiring only limited social interaction; collaborate with supervisors; maintain routine social interactions with coworkers; and set goals, travel, recognize hazards, and adapt to changes.  (AR 384–85, 407–08.)  The ALJ afforded "significant weight" to these opinions on the grounds that: (1) Drs. Atkins and Hurley are "experienced in the evaluation of disability claims"; and (2) their opinions are more consistent with [Prue's] lack of consistent treatment for his impairments and the relatively benign mental health symptoms exhibited in the treatment records."  (AR 27.)

Contrary to Prue's assertion, it was proper for the ALJ to consider as a factor in evaluating these opinions that Drs. Atkins and Hurley are experienced in evaluating disability claims.  In fact, the regulations expressly require ALJs to consider this factor, stating: "State agency . . . psychological consultants . . . are highly qualified . . . psychologists . . . who are also experts in Social Security disability evaluation. Therefore, [ALJs] must consider findings and other opinions of State agency . . . psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."  20 C.F.R. § 404.1527(e)(2)(i) (citation omitted); *see* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  Moreover, in general, ALJs should give more weight to the opinions of specialists in the relevant medical area, which in this case is psychology, Dr. Atkins's and Dr. Hurley's area of specialty.  *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about

medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Prue argues that the opinions of Drs. Atkins and Hurley have limited value because they use mostly the same "boilerplate" language.  (Doc. 10 at 15.)  But in fact, as the Commissioner points out, the narrative portion of these opinions is detailed and tailored specifically to Prue, not "boilerplate."  (AR 384–85, 407.)  In contrast, the opinions of treating providers Dr. McNamara and Young are check-the-box and short-answer reports that contain no such narrative.  (AR 441–47, 513–19.)  Although Dr. Hurley, who made his opinions approximately six months after Dr. Atkins made hers, adopted Dr. Atkins's narrative summary verbatim, Prue fails to explain why this was improper and how the result would have been different had Dr. Hurley written a separate summary.  Moreover, Dr. Hurley expressly stated that the "[r]econ[sideration] evidence is consistent with [the summary]" (AR 407), indicating that he considered evidence submitted after Dr. Atkins made her opinions.

Although, as Prue points out, in many cases it is proper for the ALJ to give reduced weight to the opinions of non-examining agency consultants like Drs. Atkins and Hurley here, in favor of the opinions of the examining medical providers; the regulations clearly permit the opinions of non-examining agency consultants to override those of examining sources, when the former are more consistent with the record evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported

by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the opinions of consultants Drs. Atkins and Hurley are consistent with the record, which documents Prue's lack of consistent treatment and relatively benign symptoms recorded in treatment notes, as discussed above.  These opinions are also consistent with the opinions of examining consultant Dr. Theodore Williams.  (AR 401–04.)

        In May 2010, Dr. Williams recorded that, although Prue complained of depression and anxiety, and he "presented in a manner which suggested moderate depression," he was "friendly, cooperative[,] and motivated to put forth his best effort on the various tasks and questions presented to him."  (AR 403.)  Dr. Williams observed that Prue was oriented to time, place, person, and situation; his affect was "consistent with his mood and/or the topic of conversation"; and he "did not appear confused or present with comprehension deficits."  (*Id.*)  Although Dr. Williams recorded that Prue distracted easily, he found that Prue had no difficulty following directions, intact memory abilities, average cognitive abilities, and an ability to attend and concentrate for "at least an hour." (AR 404.)  Dr. Williams diagnosed Prue with major depressive disorder "which may be exacerbated by the demise of his physical condition."  (*Id.*)  Although Prue has apparently abandoned his claim based on his physical impairments, Dr. Williams focused largely on Prue's physical functional limitations—including his difficulty bending, lifting, standing, sitting, and walking—rather than on his mental limitations.  (*Id.*)  In any event, Dr. Williams did not find Prue to be severely limited in his ability to function,

stating merely that the combination of Prue's physical impairments and his depression would likely result in "some restriction of [Prue's] daily activities."  (*Id.*)

### III.    The ALJ's RFC Determination Is Supported by Substantial Evidence.

Next, Prue claims the ALJ erred in his RFC determination.  Specifically, Prue asserts that the ALJ accounted for his limitations in arbitrary ways, and that the RFC determination is not supported by the medical records.  The Court disagrees.

In determining Prue's RFC, the ALJ acknowledged that Prue was functionally limited by his mental impairments.  The ALJ stated: "[Prue's] mental health problems are significant, marked by difficulties with managing anger and dealing with other people generally."  (AR 25.)  But the ALJ noted that Prue's use of Adderall helped to limit his ADHD symptoms, and that Prue's depression and PTSD did not preclude him from working.  (*Id.*)  The ALJ explained that, as a result of his PTSD, ADHD, and depression, Prue was limited to "the performance of work that is simple and routine in nature and that is largely isolated from the public, with only passing and casual, or superficial interactions with co[]workers and supervisors."  (*Id.*)  The ALJ further stated that Prue was unable to work in "any sort of team environment, or work with co[]workers and supervisors on a regular and sustained basis."  (*Id.*)  This assessment is supported by the opinions of consulting physicians Drs. Atkins, Hurley, and Williams, discussed above, as well as by the record as a whole.  *See* 20 C.F.R. § 404.1545(a)(1) ("We will assess your [RFC] based on all the relevant evidence in your case record.").

With respect to Prue's ability to concentrate, the ALJ found that Prue could maintain concentration for 30 minutes at a time before needing to take a break for three-

19

to-five minutes to refocus.  (AR 23.)  Prue claims this limitation "far exceed[s]" that contained in the agency physician opinions.  (Doc. 10 at 15.)  In fact, however, the ALJ's RFC finding regarding Prue's ability to concentrate is consistent with the opinions of the agency consultants.  Drs. Atkins and Hurley both opined that Prue could sustain concentration, persistence, and pace for two-hour periods but may experience "episodic exacerbations" in his symptoms which would temporarily undermine his cognitive functioning.  (AR 385, 408.)  It is reasonable to assume that the ALJ was accounting for these episodic exacerbations when he determined that Prue could maintain focus for only 30 minutes at a time and then required a short break.

Finally, Prue contends that the ALJ erred in finding that he had only mild restriction in his activities of daily living.  (AR 20–21.)  As discussed above, however, the ALJ properly relied on the agency consultant opinions in making this finding.  (AR 21 (citing AR 396, 419).)  The ALJ also cited to other substantial evidence demonstrating that Prue could prepare meals (when not stressed), shop for food and personal needs, pay bills, handle a savings account and a checkbook[3], drive a car, and clean his house.  (AR

---

[3]  Prue argues that the ALJ erred in stating that Prue was able to pay bills and handle a bank account because Prue told Dr. Williams that he was "incapable" of managing his financial affairs.  (AR 404; *see also* AR 246.)  There is a conflict in the evidence on this issue, as Prue himself stated in a Function Report—inconsistently with his apparent statement to Dr. Williams—that he was able to pay bills and handle a bank account.  (AR 208.)  Factual conflicts like this are for the ALJ to resolve, and thus there is no error.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.") (citing *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)).

21 (citing AR 206–08, 404).)[4]  It was proper for the ALJ to consider Prue's daily activities in determining his RFC.  *See Ortiz v. Astrue*, 875 F. Supp. 2d 251, 258 (S.D.N.Y. 2012) ("In undertaking the RFC analysis, the Commissioner considers 'all of the relevant medical and other evidence,' including the claimant's daily activities") (quoting 20 C.F.R. §§ 416.912(b)(3), 416.945(a)(3)); *see also* 20 C.F.R. § 404.1529(c)(3) (a claimant's "pattern of daily living" is "an important indicator of the intensity and persistence of [the claimant's] symptoms").  Therefore, the ALJ did not err in finding that Prue's mental impairments only mildly restricted him from engaging in activities of daily living.

## Conclusion

For these reasons, the Court DENIES Prue's motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 15), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 6th day of January, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

---

[4]  The ALJ also deduced from Dr. Williams's notation that Prue "believes he is capable of taking care of small children" (AR 404), that "[Prue] is likely capable of caring for himself as well" (AR 21). Prue finds the ALJ's "leap" from his *belief* in what he is capable of doing to what he is *actually* capable of doing "troubling" (Doc. 10 at 17), and the Court agrees.  However, the error is harmless, as the ALJ did not place significant reliance on this finding and gave many other good reasons, discussed herein, to support his decision.